SO ORDERED.

SIGNED this 29 day of September, 2017.



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| NOA, LLC | 17-02097-5-JNC |
| DEBTOR | |

### MEMORANDUM OPINION REGARDING MOTION TO APPOINT CHAPTER 11 TRUSTEE

A hearing was held in Greenville, North Carolina on September 14, 2017 on the Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a), or in the Alternative, Motion to Convert Case to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) filed by Branch Banking & Trust Company ("BB&T"), Dkt. 130 (the "Trustee Motion"). At the hearing, the court indicated that a chapter 11 trustee would be appointed, and an order appointing John C. Bircher, III as chapter 11 trustee was entered the same day, Dkt. 169 (the "Trustee Order"). This Memorandum Opinion serves to further explain the reasons and basis for the court's decision.

### JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and this court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. This court has the authority to hear this matter

pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND

NOA, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on April 28, 2017 (the "Petition Date"). Dkt. 1. The Debtor is a North Carolina member-managed limited liability company founded and incorporated by Insaf Nehme ("Mr. Nehme") in 2003. He is the sole owner of the company and serves as its chief executive. The Debtor has two separate and distinct lines of business: it sells imported artwork, furniture, and carpets from its store in Raleigh (the "Raleigh Building") and from a leased location in Atlanta, Georgia, and it sells and ships bulk clothing abroad from its warehouse in Sanford, North Carolina (the "Sanford Building").

Prior to the Petition Date, on October 12, 2012, Bank of America, N.A. ("BOA") extended a loan to the Debtor in the amount of $600,000, which was reportedly secured by a Deed of Trust in favor of BOA encumbering the Sanford Building and recorded in the Lee County Registry. The Sanford Building, located at 2018 Boone Trail Road, Sanford, North Carolina, was purchased by the Debtor in 2012 for approximately $1.2 million. Prior to the Petition Date, BOA sought to foreclose upon the Sanford Property, which the Debtor reports was the impetus in filing the case.

In addition to the Raleigh Building and Sanford Building, which are collectively valued by the Debtor at $4.85 million,[1] the Debtor's other major assets consist of bulk clothing inventory in Sanford valued at $220,000, and imported art and furniture inventory in Raleigh valued at $2.7

---

[1] The Raleigh Building is valued by the Debtor at $1.35 million and is subject to a first priority lien in favor of BB&T in the amount $477,299.87, while the Sanford Building is listed at a value of $3.5 million, and is subject to liens in the amounts of $530,000, $453,011.38, and $42,434.00 in favor of BOA, U.S. Small Business Administration, and the Lee County Tax Collector, respectively. *See* Schedule D, Dkt. 41 at 13–15.

million.[2] Further, the Debtor listed approximately $1.2 million in aged receivables, but did not indicate if collection thereof was doubtful or uncollectible.

## CASH COLLATERAL ORDERS

The Debtor sought to continue its business operations in chapter 11 and filed an Emergency Motion to Use Cash Collateral on May 1, 2017, Dkt. 15 (the "Cash Collateral Motion"), which was heard on May 3, 2017 (the "First Cash Collateral Hearing"). Both BB&T and BOA assert liens on the Debtor's cash collateral, as well as its bulk clothing inventory. A proposed budget for use of certain cash collateral in the regular operation of Debtor's business was submitted by a proposed consent order and approved by the court in the Interim Order Allowing Use of Cash Collateral dated May 4, 2017, Dkt. 28 (the "First Cash Collateral Order"). Within the budgetary confines of the First Cash Collateral Order, the Debtor was permitted to continue its business operations as a chapter 11 debtor-in-possession pursuant to 11 U.S.C. § 1107.

The return date for continued use of cash collateral was set for May 30, 2017 (the "Second Cash Collateral Hearing"). At that hearing, the Debtor reported that its optimistic projections in the proposed budget accompanying the First Cash Collateral Order fell short because it failed to collect a $200,000 receivable that it had anticipated receiving and using to fund its operations during the prior month.[3] Thus, the Debtor proposed what it characterized as an "austerity budget" for the next period for which the use of cash collateral would be authorized. The Second Cash Collateral Hearing resulted in the Second Interim Order Granting Motion to Use Cash Collateral

---

[2] Schedule A/B: Assets-Real and Personal Property, Dkt. 41 at 7.
[3] The Debtor's budget accompanying the First Cash Collateral Order projected income of $210,000 and expenses of $152,206.00, with $10,000 of income derived from the continued sale of furniture and rugs from its Raleigh location, and the remaining $200,000 from the receivable that it was unable to collect. *See* First Cash Collateral Order, Dkt. 28 at 6.

3

dated June 14, 2017, Dkt. 68 (the "Second Cash Collateral Order"). The Second Cash Collateral Order permitted the Debtor to use cash collateral under an attached line-item budget for the full month of June 2017 (the "Second Cash Collateral Budget"). As part of the Second Cash Collateral Budget, the Debtor projected income of $96,000 in bulk clothing sales[4] to a "new customer" located in Beirut, Lebanon, to which goods would be shipped (the "Beirut Shipment"). Further, it became clear as a result of the Debtor's testimony at the Second Cash Collateral Hearing that the uncollected $200,000 "receivable" in fact was not a receivable, but instead represented a forecast sale of bulk clothing, the shipment of which had not yet occurred.[5] Counsel for BB&T voiced concern regarding accountability for the Debtor's inventory, which the Debtor routinely shipped overseas in the course of its bulk clothing business, and proposed to do again in making the Beirut Shipment. Additionally, it later became clear that several other significant aged receivables originating from sales of bulk clothing sold to foreign buyers that the Debtor scheduled as assets were unlikely to be collected.[6]

---

[4] *See* Second Cash Collateral Order, Dkt. 92 at 6.

[5]
Mr. Janvier: "Have we already shipped that $200,000 worth of inventory?"
Mr. Nehme: "No."
Mr. Janvier: "So that is sitting in the Sanford location?"
Mr. Nehme: "Ready to be shipped."
Mr. Janvier: "Ok. Why haven't we shipped it?"
Mr. Nehme: "Because we didn't receive the money and, you know, the customer, you know, he's worried about after we filed the bankruptcy and the news hit, so he's worried he wants us to make sure we ship the merchandise before he sends the money. So we're going to send him copy of the proof that we're going to ship the merchandise. When he wires the money we [will] send him the original documents."

Audio of Second Cash Collateral Hr'g, Dkt. 51 at 00:11:32 – 00:12:12.

[6] For example, the Debtor had a receivable worth roughly $950,000 due and payable from a buyer in Angola that had not been paid and had been "owing for quite some time" that the Debtor acknowledged would be difficult to collect, and, in fact, was "not confident that it's going to come in." Audio of Third Cash Collateral Hr'g, Dkt. 81 at 00:06:05 – 00:07:03.

4

## THE EXPORT RESTRICTION AND ITS VIOLATION

Significantly, and in large part due to the concerns of BB&T, the Second Cash Collateral Order, which was negotiated by the parties and submitted to the court as a proposed consent order, added the following provision that was absent in the First Cash Collateral Order:

> The Debtor shall dispose of no asset of the Debtor outside the ordinary course of business, except upon approval of this Court. The Debtor shall not transfer the bill of lading to complete transfer of bulk clothing ***nor allow bulk clothing to leave the ports of [the] United States until full payment for such inventory is wired to and received by the Debtor.***

Second Cash Collateral Order, Dkt. 68 at 4 (emphasis added) (hereinafter, the emphasized portion of the above language shall be referred to as the "Export Restriction"). Thus, beginning on June 14, 2017, when the court approved and entered the Second Cash Collateral Order, the Debtor was expressly forbidden from shipping any of its bulk clothing inventory overseas until it had the funds from the buyer in its possession, including the Beirut Shipment.

The Export Restriction was not a one-time casual concession by the Debtor to its creditors. Rather, it was a specific point of negotiation between the Debtor and its secured creditors BB&T and BOA. Following the entry of the Second Cash Collateral Order, two additional orders allowing the Debtor to use cash collateral were entered, the next on July 6, 2017, and then another on August 4, 2017, each of which contained the same Export Restriction, and each of which was first negotiated by the parties and submitted to the court as a proposed consent order before being approved and entered. *See* Interim Order Allowing Use of Cash Collateral, Dkt. 92 (the "Third Cash Collateral Order"); Interim Order Allowing Use of Cash Collateral, Dkt. 116 (the "Fourth Cash Collateral Order").

The Export Restriction was similarly not hidden boilerplate that the Debtor might have missed. Rather, the crafting of the Export Restriction was a central issue in the Second Cash

5

Collateral Hearing when the Debtor first proposed to make the Beirut Shipment.[7] During that hearing the Debtor not once, not twice, *but thrice* acknowledged that the payment for the Beirut Shipment would be received before the goods left the United States.[8] Further, the Export Restriction was again mentioned at the hearing preceding the entry of the Third Cash Collateral Order conducted in Greenville, North Carolina on June 22, 2017 (the "Third Cash Collateral Hearing").

Notwithstanding the Export Restriction contained in three (3) prior orders of this court, and numerous verbal assurances to the contrary by Mr. Nehme, the Debtor allowed the Beirut Shipment to leave the United States without having received payment for it from the buyer. This violation of the Export Restriction was first alleged by BB&T when it filed a Notice of Default on August 16, 2017 and withdrew its consent from the Fourth Cash Collateral Order. Dkt. 129. BB&T filed the Trustee Motion the following day. The Debtor, in its Response, admitted to the court that the Debtor violated the terms of the Export Restriction:

> The Debtor has, unintentionally, violated the terms of the existing cash collateral order by allowing goods to leave the country before payment by wire was received. The Debtor remains in control of those goods even though they are outside of the United States.

---

[7]
  Mr. Nehme: "The shipment will stay in the U.S. 10-15 days before it leaves."
  Mr. Bruton (counsel for BOA): "Ok. So you'll get paid before the boat leaves?"
  Mr. Nehme: "Yeah."
Audio of Second Cash Collateral Hr'g, Dkt. 51 at 00:22:46 – 00:22:56.

[8]
  Ms. Walters (counsel for BB&T): "When in that 30 day time frame are you getting the money?"
  Mr. Nehme: "Within 10 days maybe. Ten to fifteen days."
  Ms. Walters: "Ok. And will that be before the boat, the shipment, ever leaves . . . ."
  Mr. Nehme (interjecting): "The U.S."
  Ms. Walters: ". . . The U.S."
  . . .
  Mr. Janvier (counsel for the Debtor): "I want to make sure I understand: going forward with these two containers that we're getting ready to sell, we get the money before the boat leaves the dock?"
  Mr. Nehme: "Yes sir."
Audio of Second Cash Collateral Hr'g, Dkt. 51 at 00:38:46 – 00:39:00, 00:42:06 – 00:42:19. *See also id.* n. 13.

Response, Dkt. 160 at 1.

At the hearing on the Trustee Motion (the "Trustee Motion Hearing"), Mr. Nehme and his brother, Isam Nehme ("Sam Nehme") both testified. Sam Nehme testified that he was the Director of Operations of the Debtor, and that he was aware of the Export Restriction and its application to the Beirut Shipment, but that the Debtor decided to ship the clothing regardless and accept the risk that payment would not be received before the goods left the United States. He stated:

> This was a hard *choice for us*. We need the money. We need this customer, not to lose this customer. And, ah, if we chose not to put the container on board, this means that the whole month we cannot do anything. So *we chose*, uh, we *took this risk* . . . .

Audio of Trustee Motion Hr'g, Dkt. 168 at 00:02:20 – 00:02:40 (emphases added).

Mr. Nehme testified that several months ago the Debtor received a $92,000 check drawn on a bank in Lebanon (the "Beirut Check") from the prospective buyer as a "guarantee" of future performance. If honored, the Beirut Check would only cover a portion of the value of the shipment. Both men testified that an attempt to present the Beirut Check for payment at a United States bank was unsuccessful because they were informed that negotiating it would take several weeks to several months.[9]

Perhaps most illustrative of the nature of the Debtor's violation of the Export Restriction, and contrary to its assertion that the violation of the Export Restriction was "unintentional," Sam

---

[9]

Sam Nehme: "[H]e said take this check, use it as a guarantee. If I default, you could pressure me and deposit the check. So we have it as a guarantee and we still have it."
Ms. Walters: "Okay. And so he hasn't paid you so why has it not been deposited?"
Sam Nehme: "Because we're faced with this dilemma. You know, we tried, we went to the bank three times to see if we could speed it up to cash it. And the bank apparently takes too long in collection."
. . .
Ms. Walters: "And have you deposited the check?"
Mr. Nehme: "No. I went to the bank and they said it takes a long time to collect."
Audio of Tr. Mot. Hr'g, Dkt. 168 at 00:20:24 – 00:20:53, 00:44:14 – 00:47:21.

Nehme acknowledged that the Debtor consciously took the risk that the Export Restriction would be violated when it surrendered the Beirut Shipment to the carrier without having received payment from the buyer:

> Mr. Janvier: "I'm going to ask you a third time. Did you expect to have the money before these goods left the United States?"
>
> Sam Nehme: (after a long pause) "Fifty-fifty."

Audio of Trustee Motion Hearing, Dkt. 168 at 00:04:51 – 00:05:01.

The court finds, based on the testimony of Mr. Nehme and Sam Nehme, that the Debtor knowingly and willfully violated the Export Restriction and placed the risk that it would not receive payment for the Beirut Shipment on its secured creditors, which risk ultimately materialized, as the Debtor had yet to receive any payment for the Beirut Shipment as of the Trustee Motion Hearing.

## APPOINTMENT OF A TRUSTEE

Section 1104(a) of the Bankruptcy Code requires the court to appoint a chapter 11 trustee in two circumstances:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interest of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a). Similarly, Section 1112(b)(1) provides the court with discretion to appoint a trustee rather than convert or dismiss a case under chapter 11, if the court determines that appointment of a trustee "is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).

At the outset, the threshold issue to be established is whether "cause" exists under sections 1104 or 1112. A finding of cause under section 1112 mandates conversion of the case to one under chapter 7 or dismissal, unless the appointment of a trustee is in the best interests of creditors and the estate. Likewise, a finding of cause under section 1104 cabins the court's discretion and mandates the appointment of a trustee. While both sections 1104 and 1112 list situations constituting "cause," *see* 11 U.S.C. §§ 1104(a)(1) and 1112(b)(4), neither list is intended to be exhaustive. *See, e.g.*, *Quarles v. U.S. Tr.*, 194 B.R. 94, 96 (W.D. Va. 1996); *In re Russell*, 60 B.R. 42, 45 (Bankr. W.D. Ark. 1985).

### I.   CAUSE EXISTS TO CONVERT OR DISMISS THE CASE UNDER § 1112

Where a motion under section 1112 seeking conversion or dismissal of a case is opposed, as here, the movant bears the burden of proving cause exists by a preponderance of the evidence. *See, e.g.*, *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995). On the other hand, the party seeking the appointment of a trustee under section 1104(a) has the burden of proving the grounds, whether gross mismanagement, fraud, or other cause, by a standard of clear and convincing evidence. *In re Brown*, No. 99-06393-8-JRL, 2000 WL 34541413, at *10 (Bankr. E.D.N.C. Feb. 24, 2000) (citing *In re Microwave Prods. of Am.*, 102 B.R. 666, 670 (Bankr. W.D. Tenn. 1989)). *But see In re Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015) ("The parties seeking appointment of a Chapter 11 trustee under 11 U.S.C. § 1112(b)(1) and/or 1104(a) have the burden of proving appropriate grounds exist for such appointment by the preponderance of the evidence."). In either case, because the Debtor has admitted to violating this court's orders, the court finds that cause exists under section 1112(b)(4)(E) under either a preponderance of the evidence or clear and convincing evidence standard.

9

One of the enumerated factors constituting "cause" under section 1112(b)(4) is "unauthorized use of cash collateral substantially harmful to 1 or more creditors." 11 U.S.C. § 1112(b)(4)(D). At the hearing, Sam Nehme testified that while the Beirut Shipment had left the United States, the Debtor retained control over it by virtue of possession of the bill of lading, and could have it returned to the United States at a cost of approximately $4,000.00.[10] Counsel for the Debtor argued that the "unauthorized use of cash collateral" factor is inapplicable because the Debtor had used no cash collateral since BB&T withdrew its consent from the Fourth Cash Collateral Order on August 16, 2017.

However, even if true (as the testimony supports), the court need not decide whether the Debtor, in allowing the Beirut Shipment to leave the United States without payment in direct contradiction of the language of the Fourth Cash Collateral Order, used cash collateral without authorization.[11] The court need not even decide whether the $4,000 prospective cost of having it returned to the United States constitutes "substantial" harm to BB&T or BOA. A more apposite factor to decide the matter is presented.

Pursuant to section 1112(b)(4)(E), cause exists to require conversion or dismissal where a debtor fails "to comply with an order of the court." *Id.* Here it is undisputed that the Debtor *knowingly* violated the Export Restriction, which was a provision of not just one, but three (3) separate orders of this court. Further, all three orders were in the form of "consent orders" signed by Debtor's counsel with terms confirmed and known by Mr. Nehme and Sam Nehme as the managers and officers of the LLC Debtor. The court finds that the Debtor's violation of the Export

---

[10] Audio of Tr. Mot. Hr'g, Dkt. 168 at 00:06:39 – 00:06:54.

[11] Sam Nehme testified that the Beirut Shipment was transported to a seaport in Norfolk, Virginia prior to departing the United States. The court assumes, without deciding, that such shipment required the Debtor to use cash collateral.

Restriction was not unintentional or random, but was a knowing and willful undertaking. In short, the Debtor misled its creditors and the court in taking a calculated risk that it would collect the payment for the Beirut Shipment prior to the containers leaving the United States, a risk that Sam Nehme acknowledged was "fifty-fifty." The court will not condone such a knowing and willful failure to abide by its orders. Therefore, the court finds that cause exists under section 1112(b)(4)(E) that would mandate conversion of the Debtor's case to one under chapter 7 or dismissal, unless the appointment of a trustee is in the best interests of creditors or the estate.

## II. THE APPOINTMENT OF A TRUSTEE IS IN THE BEST INTERESTS OF CREDITORS AND THE ESTATE

Having determined that cause exists to convert or dismiss the Debtor's case, the court must weigh whether the appointment of a trustee is in the best interests of creditors and the estate. As explained below, the court determines that appointment of a trustee is in the best interests of creditors and the estate.

"Section 1112 and Section 1104 read together require the court to make a finding as to what remedy is in the best interest of the creditors and the estate." *In re Sydnor*, 431 B.R. 584, 600 (Bankr. D. Md. 2010). Thus, when considering appointing a trustee or converting the case to one under chapter 7,

> [t]he distinguishing factor . . . is the expanded possibility in Chapter 11 for a trustee using independent judgment and good management to direct the affairs of the estate[] including on-going operations (if any) in order to optimize recovery for the creditors and the estate.

*Id.*

In this case, the Debtor's intended plan of reorganization calls for an orderly liquidation of most or all of its assets. Maximizing the value of the assets and ultimate distribution to creditors will likely require patient management of its ongoing operations and renewed attempts to collect

its aging receivables or otherwise write off uncollectible accounts, precisely the type of tasks amenable to a "trustee using independent judgment and good management." *Id.* Moreover, a trustee is more likely to be able to negotiate with overseas buyers regarding the Debtor's bulk clothing sales while ensuring that such sales comply with any future authorization to use cash collateral.

The court therefore finds that cause exists and that it is in the best interests of creditors and the estate to appoint a chapter 11 trustee pursuant to 11 U.S.C. §§ 1104(a)(2) and 1112(b)(1), as directed in the Trustee Order.

**END OF DOCUMENT**